DOREEN ISERNIA,

Plaintiff,

VERSUS

CAROLYN COLVIN, COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
September 22, 2015

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Doreen Isernia ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the defendant, the Acting Commissioner of Social Security ("defendant" or "Commissioner"), denying plaintiff's application for disability insurance benefits ("DIB") as of December 3, 2010, due to anxiety and depressive disorders. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, despite certain nonexertional limitations. Therefore, the ALJ ultimately determined that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff has opposed the Commissioner's motion and filed a cross motion for judgment on the pleadings, arguing that the ALJ erred by: (1) failing to accord the appropriate weight to the opinion of plaintiff's treating physician, Dr. Filomena Buncke, and the consultative examining physician, Dr. Kathleen Acer, and instead according the greatest weight to the opinion of the defendant's medical consultant, Dr. R. McClintock; (2) failing to request testimony from a vocational expert; and (3) failing to obtain testimony from a medical expert at the hearing.

For the reasons set forth herein, the Court denies the Commissioner's motion for judgment on the pleadings, denies plaintiff's cross-motion for judgment on the pleadings, and grants plaintiff's motion to remand. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ clearly failed to properly weigh the opinion of the treating physician, Dr. Buncke, and failed to recontact

her for clarification of her opinion and development of the record. It is well-settled that the ALJ must recontact the treating physician where, as here, the physician's information is determined to be unclear or inadequate to determine whether the claimant is disabled. Thus, although there may be evidence in the record from other doctors to support the ALJ's finding, the ALJ should have recontacted Dr. Buncke for clarification of the reasons for her opinion before deciding to disregard it. Accordingly, a remand on that issue is warranted.[1]

I. BACKGROUND

A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

1. Personal and Work History

Plaintiff was born on February 18, 1963, making her forty-seven years old at the time of the alleged disability onset date of December 3, 2010. (AR at 51.) Plaintiff has a high school diploma and completed two years of college. (*Id.*) She currently lives with her sister without paying rent, though she is able to pay some personal bills. (*Id.* at 30, 42). Prior to December 3, 2010, plaintiff worked as an office assistant, a receptionist (both described as semi-skilled, sedentary work according to the ALJ), and most recently as a concierge/recreation coordinator at an assisted living facility (unskilled, light work according to the ALJ). (*Id.* at 23, 140.) Previously, plaintiff had worked as a sales administrator, a nurse's aide in a nursing home, and an office assistant in a dermatologist's office. (*Id.* at 140.) Plaintiff has not worked since her alleged disability onset date. (*Id.* at 31.) According to the "Function Report" she submitted as part of her DIB application, plaintiff can walk, sit, stand, reach, and use her hands; she can climb stairs, though it exhausts her at times; and she can kneel, though it hurts her knee. (*Id.* at 136-37.) Plaintiff testified that she drives locally approximately three times a week. (*Id.* at 37.) Plaintiff sometimes travels alone, but usually leaves the home in the company of another person, preferring to do so because of the possibility of suffering a panic attack. (*Id.* at 46.) Plaintiff has stopped cooking since the onset of her illness, but helps her sister with household chores such as cleaning, laundry, ironing, and planting. (*Id.* at 35-36, 134.) Plaintiff does not go food shopping because she does not like stores, but at times will drive with her sister to the store and wait in the car. (*Id.* at 36.) Plaintiff testified that she does have one friend other than her sister whom she sees occasionally, but she generally does not go out with friends or engage in social activities, and instead stays at home reading books and watching movies and television dramas. (*Id.* at 36-39, 46.) Although plaintiff frequently gets up and moves around during movies, she is able to follow plots. (*Id.* at 36.) Plaintiff stated that she also leaves the house for weekly therapy sessions and monthly visits with her psychiatrist. (*Id.* at 39.)

2. Medical History

Several years before the alleged disability onset, on February 20, 2006, plaintiff was hospitalized after she attempted to commit suicide by ingesting thirty Xanax pills. (*Id.* at 172.) Plaintiff was in the process of a divorce, and had recently had an argument with her juvenile daughter. (*Id.*) Plaintiff

---

[1] Because the Court determines that this case should be remanded for the reasons discussed herein, the Court need not and does not address plaintiff's other arguments.

2

was diagnosed with "major depressive disorder, mild-to-moderate without psychosis, adjustment disorder not otherwise specified." (*Id.* at 173.) Plaintiff was prescribed multiple medications for her depression, and discharged on February 27, 2006. (*Id.* at 172.)

Plaintiff's treatment history subsequent to her attempted suicide is unclear, but in December of 2010, she quit her position at the assisted living facility allegedly due to her depression and anxiety disorders' interference with her ability to perform her job. (*Id.* at 33.) Plaintiff sought treatment for her condition from Dr. Filomena Buncke, Ph.D, N.P., with whom she had her first visit on May 2, 2011, and saw regularly thereafter. (*Id.* at 161-68.) According to the June 29, 2011 report submitted by Dr. Buncke to the Administration after having had approximately five visits with plaintiff, Dr. Buncke diagnosed plaintiff with major depressive disorder, severe with psychotic features. (*Id.*) Dr. Buncke stated that plaintiff's symptoms were depression, anxiety, insomnia, agitation, decreased concentration, and decreased memory, and stated that the expected duration and prognosis for plaintiff's condition was unknown. (*Id.* at 162-63.) Dr. Buncke described plaintiff's attitude, appearance, and behavior as cooperative despite her depression, and her speech, thought, and perception as coherent and reality-based. (*Id.* at 165.) However, in analyzing plaintiff's sensorium and intellectual functions, Dr. Buncke noted that plaintiff's mood and affect were depressed and blunted, and stated that her attention and concentration were diminished. (*Id.*) Dr. Buncke stated that plaintiff could perform activities of daily life though she was unable to shop for herself and required someone to drive her to appointments; Dr. Buncke concluded that plaintiff was unable to function in a work setting, however. (*Id.* at 166.) Dr. Buncke noted that plaintiff had no limitation on social interaction, but she was limited on adaption skills due to her increased anxiety. (*Id.* at 167.) Dr. Buncke was treating plaintiff's condition with prescriptions for Effexor XR, Xanax, and Ambien. (*Id.* at 163.)

Dr. Buncke continued to treat plaintiff subsequent to this report (and the filing of her DIB claim). On July 22, 2011, Dr. Buncke wrote in her treatment notes that plaintiff stated she was "wanting to die," that she was staying at a friend's house, and needed people around. (*Id.* at 218.) Dr. Buncke increased plaintiff's medication. (*Id.*)

Defendant referred plaintiff's file to Dr. R. McClintock, a consulting physician for the Administration, in August 2011. (*Id.* at 182-83.) Upon initially reviewing the file, Dr. McClintock noted the "brief duration" of treatment and "minimal information" contained within Dr. Buncke's report relating to the specific symptoms. (*Id.* at 182.) While Dr. McClintock was reviewing the file, Dr. Buncke submitted an update to her report dated August 22, 2011, in which she stated that plaintiff "continues to exhibit [increased signs and symptoms] of major depression. She is unable to fulfill obligations, her symptoms of insomnia continue as well as [diminished] concentration, memory, and appetite. Her prognosis is fair." (*Id.* at 179.) Dr. McClintock updated his response to the Administration's request for medical advice in response, stating that he still found the information insufficient to arrive at a determination, and recommended a consultative examination. (*Id.* at 182.)

Plaintiff continued to be treated by Dr. Buncke,[2] but on September 8, 2011, plaintiff

---

[2] Dr. Buncke's notes from this period reflect that she saw plaintiff regularly for medication management and other issues; for example, on September 7, 2011, plaintiff stated that she was feeling better but that

3

saw Dr. Kathleen Acer, Ph.D., for the consultative evaluation. (*Id.* at 184-87.) Dr. Acer found plaintiff to be cooperative and presenting in an adequate manner during the evaluation, though her affect and mood were anxious. (*Id.* at 185.) With respect to plaintiff's vocational capacities, Dr. Acer found that plaintiff could follow and understand simple instructions and directions, as well as perform simple tasks, but she had trouble maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks independently. (*Id.* at 186.) Dr. Acer noted that plaintiff's evaluation was consistent with plaintiff's psychiatric issues and could significantly interfere with her functioning on a daily basis. (*Id.*) Dr. Acer diagnosed plaintiff with major depressive disorder (moderate, recurrent), generalized anxiety disorder, and panic disorder with agoraphobia. (*Id.*) Dr. Acer recommend that plaintiff continue psychiatric treatment and seek additional counseling. (*Id.* at 187.)

After Dr. Acer submitted her report based on her examination of plaintiff, Dr. McClintock finalized his consultant review of plaintiff's file on October 3, 2011. (*Id.* at 188-207.) Dr. McClintock concluded that plaintiff had a medically determinable impairment, but it did not meet the diagnostic criteria for Affective Disorders under Listing 12.04 or Anxiety-Related Disorders under Listing 12.06. (*Id.* at 188-93.) In his assessment of plaintiff's functional limitations, Dr. McClintock found that plaintiff had mild restrictions of activities of daily living, and moderate difficulties in maintaining social functions, concentration, persistence, and pace. (*Id.* at 198.) Dr. McClintock also found that plaintiff had one or two repeated episodes of deterioration of extended duration, which did not satisfy the functional criteria. (*Id.*) In his residual functional capacity assessment, Dr. McClintock concluded that plaintiff was moderately limited in her abilities to carry out detailed instruction, to maintain attention and concentration for an extended period, to maintain a regular schedule, to complete a normal work day and work week without interruption from her psychologically based symptoms, to perform at a consistent pace without reasonable rest periods, to maintain socially appropriate behavior, to respond appropriately to changes in the work setting, and to set goals and make plans independent of others. (*Id.* at 202-03.) Dr. McClintock found that she was not significantly limited in the other listed capacities. (*Id.*) Therefore, Dr. McClintock concluded that plaintiff was capable of basic work activities, such as those she had previously performed, noting that plaintiff's consultative examination was "not very remarkable." (*Id.* at 204.)

Plaintiff continued her treatment with Dr. Buncke along with therapy until her insurance plan changed in July 2012, when plaintiff began going to the Pederson-Krag Center, where she was given an Adult Comprehensive Assessment by J. DiGiovanni, LCSW, and a psychiatric evaluation by Dr. Yuan-Fang Chen, M.D. (*Id.* at 240-260.) Ms. DiGiovanni diagnosed plaintiff with major depressive disorder (recurrent, moderate), and Dr. Chen diagnosed her with a history of major depressive disorder (moderate) and a history of anxiety disorder. (*Id.* at 243, 251.) Dr. Chen's notes reflect that plaintiff presented as feeling depressed and anxious at times. (*Id.* at 253.) The examiners noted that plaintiff reported a family history of depression and alcoholism, and that she was

---

Ambien was not assisting her with sleep (AR at 217), and on November 17, 2011, plaintiff informed Dr. Buncke that she was feeling well enough that she had obtained an off-the-books, part-time job at a thrift shop. (*Id.* at 216.)

suffering from stress caused by seeking permanent housing and a relationship. (*Id.* at 240, 258.) Ms. DiGiovanni concluded that plaintiff would benefit from learning coping tools aimed towards creating stability, as well as a psychiatric evaluation and continued medication management. (*Id.* at 250.) Dr. Chen prescribed plaintiff Trazadone, Prozac, and Xanax, and recommended that plaintiff follow up with psychotherapy treatment. (*Id.* at 235.)

### 3. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified before the ALJ on August 28, 2012. Plaintiff testified that she has not worked since December 13, 2010. (*Id.* at 31.) Plaintiff testified that at one point during the disability period she worked at a friend's thrift store for about a month without receiving compensation. (*Id*. at 31-32.) Plaintiff stated that she was not being paid for her time, however, because she was "just sitting there and [she] wasn't really working," instead simply minding the store if her friend had to run an errand. (*Id*.) Plaintiff also testified about the job she had at the assisted living facility immediately prior to the onset of her disability. (*Id.* at 32.) Plaintiff stated that she was forced to stop working because she would become depressed and cry throughout the day, especially triggered by being around a lot of people, seeing a certain type of dog, hearing a certain song on the radio, hearing people talk about their parents (due to the loss of her mother), or having a boss who raised his or her voice with employees. (*Id.* at 33-34.) Plaintiff stated that she would have trouble getting out of bed the morning after days at work like this. (*Id.* at 33.)

Plaintiff also testified that she experienced sudden anxiety attacks which cause her to physically shake and pace. (*Id.* at 34). Plaintiff testified that during a panic attack, her mind would race and she was unable to concentrate, her hands would shake, and she would suffer from an elevated heart rate and hyperventilation. (*Id.* at 34, 48.) Plaintiff claimed that the panic attacks would last anywhere from one to five hours, but that Xanax helped to moderate the symptoms. (*Id.* at 48.)

Plaintiff stated that she finds it difficult to find motivation to get up in the morning or to take a shower. (*Id.* at 34.) She rarely socialized, and left the home mostly to go to the store with her sister or to the library, walk laps around their apartment complex, or sit outside. (*Id.* at 34-39.) Plaintiff further testified that she was then seeing a psychiatrist on a monthly basis and a psychologist weekly for therapy at the Pederson Krag Center. (*Id.* at 39.) She was then being prescribed Xanax, Prozac, and Trazadone to help her stay "even keel," but she suffered from tiredness as a side effect of the medications. (*Id.* at 39-40.) Plaintiff also testified that she has trouble with her short-term memory and concentration, and that her mind frequently races. (*Id.* at 44-47.)

### B. Procedural History

On June 6, 2011, plaintiff filed an application for DIB, alleging disability as of December 3, 2010 due to depressive and anxiety disorders. (*Id.* at 16, 100, 208.) Plaintiff's application for DIB was denied on October 5, 2011. (*Id.* at 16, 52-55.) On November 7, 2011, plaintiff filed a request for an administrative hearing. (*Id.* at 16.) Plaintiff and her attorney appeared before ALJ Michael Crawley on August 28, 2012. (*Id.* at 27-50.)

In his October 25, 2012 decision, the ALJ found that plaintiff "has not been under a disability within the meaning of the Social Security Act since December 3, 2010." (*Id.* at 16.) The ALJ concluded that the evidence did not establish a substantial loss of the

5

ability to carry out basic work-related activities required for unskilled work. (*Id.* at 22.) This was the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 24, 2014. (*Id.* at 1-7.)

Plaintiff filed this action on April 21, 2014. The Commissioner served the administrative record and filed an answer on July 18, 2014, and filed her motion for judgment on the pleadings on August 21, 2014. Plaintiff filed her cross-motion for judgment on the pleadings on September 18, 2014. Defendant filed her reply on October 3, 2014.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the

6

claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Analysis

According to plaintiff, the ALJ erred in failing to request testimony from a vocational expert, in failing to give proper weight to the opinions of her treating physician and instead relying on the opinion of a non-examining/non-treating physicians, and in failing to have a medical expert present to testify. As set forth below, the Court concludes that the ALJ failed to recontact Dr. Buncke, plaintiff's treating physician, to further develop the record and, therefore, improperly gave her opinion less weight. Thus, the case must be remanded for further development of the record and for clarification of Dr. Buncke's opinion, so that the ALJ may make a proper disability determination. The Court, therefore, declines to address plaintiff's other arguments in support of her appeal.

1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefit. (*Id.* at 17-18.)

a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 3, 2010. (AR at 18.) The ALJ found that plaintiff's alleged earnings of $726.88 during 2011 did not constitute evidence of substantial gainful activity. (*Id.*) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the following severe impairments: anxiety

7

disorder and depressive disorder, which cause significant limitations on plaintiff's ability to perform basic work activities. (AR at 18-19.) The ALJ found that plaintiff did not have any medically determinable physical impairment. (*Id*.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 19.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

d. Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id.* § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that she is not disabled. *Id*.

In this case, relying primarily on the opinion from the consultant, Dr. McClintock, the ALJ found that plaintiff had retained the "residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she has frequent ability to understand, remember, and carry out only simple instructions, she can frequently interact appropriately with co-workers and supervisors, and frequently respond to changes in a routine work setting." (AR at 20.) The ALJ concluded that these nonexertional limitations do not preclude plaintiff from performing her past relevant work as a recreation aide at an assisted living center. (*Id.* at 23.)

Although the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause panic attacks, depression, and anxiety, the ALJ noted plaintiff's testimony that Xanax helped to control her panic attacks, and that she is able to engage in such activities as household chores, reading, watching television, and going to the store or the library. (*Id*. at 21.) The ALJ appeared to place a significant amount of emphasis on one line in the treatment notes from plaintiff's November 17, 2011 visit with Dr. Buncke, in which Dr. Buncke reported that plaintiff was "feel[ing] so much better." (*Id.* at 21, 216.) The ALJ also asserted that there was an inconsistency with respect to the plaintiff's part-time work at the thrift shop, where plaintiff testified that she worked there for "about a month," but Dr. Buncke's treatment notes seemed to indicate that plaintiff started working at the thrift store around November 2011 and continued through at least February 2012. (*Id*. at 21, 31, 214-16.) The ALJ further noted that plaintiff's evaluations from the Pederson Krag Center in July 2012 characterized her depressive disorder as "only moderate" and commented on her fair presentation to interviewers. (*Id.* at 21.) The ALJ found that plaintiff's statements concerning her subjective symptoms including the intensity, persistence, and limiting effects of these

8

symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (*Id*. at 21.) The ALJ asserted that plaintiff in her testimony and in some of the treatment notes admitted to performing activities that the ALJ perceived to be "inconsistent with her claim for disability," such as dressing, bathing, grooming herself, following plots on television, and traveling locally about three times a week. (*Id.* at 22.)

In so finding, the ALJ accorded greatest weight to the opinion of state agency consultant Dr. McClintock "as it is consistent with treatment notes." (*Id*. at 22.) The ALJ accorded some weight to Dr. Acer's opinion, though he gave "little weight to her opinion that the claimant would have difficulty maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, adequately relating with others, and dealing with stress, as it is inconsistent with treatment notes and claimant's admissions." (*Id.*) Finally, the ALJ accorded little weight to Dr. Buncke's opinion, because he found that her assessment of plaintiff's diminished capacity and disability was "vague and does not provide a function by function assessment of the claimant's mental limitations and is inconsistent with treatment notes and claimant's admissions." (*Id.*)

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id*. § 404.1560(c); *see, e.g. Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998).

In this case, the ALJ found that plaintiff was able to perform her past relevant work as a recreation assistant at an assisted living center. (AR at 22-23.) Therefore, the ALJ did not evaluate step five. (*Id.*)

2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ failed to accord the proper weight to her treating physician, Dr. Buncke. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Buncke, and remands the case on this basis.

a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see, e.g., Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

9

examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinion concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Perez v. Astrue*, No. 07-CV-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is this not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources.") (internal citation and quotation marks omitted). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

"'Furthermore, the ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear.'" *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012) (quoting *Ellett v. Comm'r of Soc. Sec.*, No. 1:06–CV–1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011)); *see also Calzada v. Astrue*, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); *Mitchell v. Astrue*, No. 07 Civ. 285 (JSR), 2009 WL 3096717, at *17 (S.D.N.Y. Sept. 28, 2009) ("If the opinion of a treating physician is not adequate, the ALJ must 'recontact' the treating physician for clarification." (citing 20 C.F.R. §§ 404.1512(e), 416.912(e))). Such an

10

obligation is linked to the ALJ's affirmative duty to develop the record.[3] *See Perez*, 77 F.3d at 47.

b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Buncke, the treating physician. Specifically, he found Dr. Buncke's opinion to be (1) vague; (2) lacking a "function by function assessment of the claimant's mental limitations"; and (3) inconsistent with treatment notes and claimant's admissions. (AR at 22.) The ALJ failed to specify what these perceived inconsistencies were, but presumably he meant that her opinion as to plaintiff's disability was contradicted by the specific facts he noted in support of his own conclusion, namely: (1) the notation that plaintiff said she was feeling better at one of her appointments with Dr. Buncke in November 2011; (2) her part-time job at the thrift shop; and (3) plaintiff's affect during her initial assessment at the Pederson Krag Center in July 2012, where they described her depressive disorder as only moderate and found that she was cooperative and otherwise fair in presentation. (*See* AR at 21.) The ALJ did not evaluate her opinion pursuant to the factors detailed in *Halloran* or recontact Dr. Buncke for clarification, and instead, simply assigned the most weight to Dr. McClintock's opinion.

The Court finds this analysis to be insufficient. The law is clear beyond cavil that where, as here, a treating physician's opinion is found by the ALJ to be vague or unclear, it is incumbent on the ALJ to recontact the treating physician for clarification of his or her opinion. The opinion of a treating physician such as Dr. Buncke cannot be discarded lightly. Dr. Buncke treated plaintiff for an extended period of time, including approximately five appointments during May and June 2011 prior to Dr. Buncke providing her initial report to the Administration, and continued regular appointments through June or July 2012, during which time Dr. Buncke provided an updated report. Dr. Buncke is also a specialist in the relevant field (psychiatry). Here, the first reason given by the ALJ as to why he accorded Dr. Buncke's little opinion was that he found it to be "vague," plainly demonstrating the need to recontact. Moreover, in this case, the value of recontacting plaintiff's treating psychiatrist is especially clear because the ALJ specifically stated what he wished Dr. Buncke had provided: a function-by-function assessment of plaintiff's various mental limitations. Obviously, a non-examining consultant physician, such as Dr. McClintock, cannot provide equivalent information or analysis. The ALJ could and should have recontacted Dr. Buncke to request this and any other relevant supplemental information to develop the record in this case.[4] *See Rosa*, 168 F.3d at

---

[3] It is well established that the ALJ must "'[a]ffirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing. *Rosa*, 168 F.3d at 79.

[4] The fact that plaintiff had recently changed insurance providers and was seeing a new physician in the month before the ALJ hearing does not affect the ALJ's duty to recontact plaintiff's treating physician during the disability period. That a plaintiff may no longer have a doctor-patient relationship with a prior treating physician, for any reason, does not affect the duty to recontact. *See, e.g.*, *Falco v. Astrue*, No. CV-07-1432 (FB), 2008 WL 4164108, at *3, 6-7 (E.D.N.Y. Sept. 5, 2008) (finding that the ALJ should have made greater efforts to recontact and obtain medical records from the plaintiff's previous psychiatrist, even though that doctor had "abruptly closed his practice and ended

79-80 (if treating physician's findings supporting disability are "wholly conclusory" or otherwise insufficiently supported, the ALJ is required to recontact the treating physician to obtain supplemental information) (citing *Clark*, 143 F.3d at 118 (a treating physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case.")); *Calzada*, 753 F. Supp. 2d at 277 ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); *Mitchell*, 2009 WL 3096717, at *17 (same). The record, however, does not show that any such efforts were made.

Furthermore, the ALJ did not specify what in Dr. Buncke's opinion was contradicted elsewhere in the record, and the Court cannot discern any such inconsistencies. Even assuming *arguendo* that the ALJ meant Dr. Buncke's opinion was contradicted by her November 2011 notation that plaintiff said she was feeling better,

plaintiff's part-time job at the thrift shop, and plaintiff's evaluation at the Pederson Krag Center in July 2012, none of these issues alone or in combination appear to call into question Dr. Buncke's opinion that plaintiff was disabled. Dr. Buncke's report was submitted to the Administration on June 29, 2011, and she submitted the update on August 22, 2011. In between those appointments, the treatment notes reflect that plaintiff told Dr. Buncke at her July 22, 2011 appointment that she felt like she wanted to die. The fact that *several months later*, in November 2011, plaintiff told Dr. Buncke that she felt better and was starting a part-time job at a friend's thrift shop does not vitiate Dr. Buncke's earlier report as to plaintiff's disability as of the onset date (December 3, 2010) through the date of the findings.[5] The opinions and observations of the Pederson Krag Center staff in July 2012—more than a year after Dr. Buncke submitted her report, during which time plaintiff was under the care of Dr. Buncke and her therapist—similarly do not affect the evaluation of Dr. Buncke's opinion. Moreover, Dr. Buncke herself, similar to Dr. Chen and Ms. DiGiovanni's observations in July 2012, stated in her June 29, 2011 report that plaintiff was cooperative, could perform many of the activities of daily life, presented

---

contact with [plaintiff] in 1996 due to his being investigated for professional misconduct").

[5] With respect to the purported disparity between plaintiff's testimony as to how long she worked part-time at the thrift shop and the notations in Dr. Buncke's treatment file, the Court is not persuaded that this is as significant an inconsistency as the ALJ and defendant purport it to be. First, the ALJ failed to note in his decision that plaintiff testified that: (1) she did not actually perform any real work at the thrift shop, instead "just sitting there" if her friend (the owner) had to leave the store for an errand; (2) she was not paid at the job; and (3) she took the job mostly to help out her friend. (AR at 31-32.) Therefore, based on this administrative record, there is nothing to suggest that this "job" (regardless of how long plaintiff

actually performed it) demonstrated significant vocational capacity on the part of plaintiff. Second, plaintiff testified she worked at the shop for "about a month" (*id.* at 32), but the treatment notes reflect that she may have been working there between November 2011 and February 2012, approximately three or four months. Given the vagueness of plaintiff's estimate, however, and the fact that the treatment notes are equally cursory and undetailed on this topic—for example, Dr. Buncke's November 17, 2011 notation states solely that plaintiff "got p/t job (off the books) thrift shop," leaving open the possibility that plaintiff informed Dr. Buncke about the job, but had not yet started working and would do so at some future date (*id.* at 216)—any inconsistency (on this record) is minimal at most.

with coherent speech and thought, and had reality-based perception. (AR at 165-66.) Those parallel observations of plaintiff's demeanor and non-vocational capabilities, however, apparently did not affect Dr. Buncke's conclusion that plaintiff was unable to function in a work setting due to her depressive and anxiety disorders.

Finally, the ALJ's rationale in according greatest weight to Dr. McClintock's opinion is flawed. The ALJ accorded greatest weight to Dr. McClintock's opinion because "it is consistent with treatment notes." (*Id.* at 22.) The ALJ did not state any other reasons for according Dr. McClintock's opinion greater weight than all of the other doctors who actually examined plaintiff, or what notes in particular he found supported Dr. McClintock. Notably, when Dr. McClintock first reviewed the file, including Dr. Buncke's findings supporting plaintiff's DIB claim, in August 2012, he found that there was insufficient information therein on which he could make an assessment and recommended that plaintiff be sent for a consultative examination. Dr. Acer performed that examination in September 2011, and reported findings that largely aligned with Dr. Buncke's, diagnosing plaintiff with major depressive disorder (moderate, recurrent), generalized anxiety disorder, and panic disorder with agoraphobia, and stating that plaintiff's psychiatric issues and various vocational capacity limitations (including trouble maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks independently) could significantly interfere with her functioning on a daily basis. (*Id.* at 186-88.)[6] Therefore, when Dr. McClintock revisited plaintiff's file in October 2011 to issue his analysis, the additional evidence he requested appeared to support a finding of disability, but notwithstanding those records and findings, Dr. McClintock arrived at the opposite conclusion.

Even aside from his failure to recontact Dr. Buncke, the Court cannot agree (absent further support) with the ALJ that Dr. McClintock's reinterpretation of the treatment notes is somehow more persuasive than the findings by the notes' originators. As Dr. McClintock's own report states, his report is based on his opinion that Dr. Buncke's notes in support of her findings (including the August 2011 update) were "insufficient" and Dr. Acer's examination results were "not very remarkable." (AR at 204.) Dr. Buncke and Dr. Acer would clearly disagree; moreover, the ALJ points only to treatment notes reflecting plaintiff's nonvocational capacities, or notes made subsequent to the issuance of Dr. Buncke and Dr. Acer's reports, as examples of treatment notes that tend not to support their findings.

Thus, in light of the ALJ's conclusion that Dr. Buncke's opinion was vague and inconsistent with prior treatment notes, a remand is necessary so that Dr. Buncke can be recontacted and be given the opportunity to supplement the record with any additional clarification or bases for her findings regarding plaintiff's disability. Once Dr. Buncke is recontacted and given that opportunity, the ALJ can again examine Dr. Buncke's opinion in light of all the evidence in the record, including Dr. Acer's similar findings and Dr. McClintock's opinion disagreeing with the others. *See Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings

---

[6] The ALJ said that he accepted Dr. Acer's findings with respect to plaintiff's generally acceptable manner and presentation, and her abilities to follow and understand simple instructions and directions and perform simple tasks, but he gave "little weight" to her opinion that plaintiff had numerous limitations on her vocational capacities because it, like his criticism of Dr. Buncke, was "inconsistent with treatment notes and the claimant's admissions." (AR at 21-22.)

were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Papadopoulos v. Astrue*, No. 10 Civ. 7980 (RWS), 2011 WL 5244942, at *8 (S.D.N.Y. Nov. 2, 2011) ("Because 'further findings' would so plainly help to assure the proper disposition of [plaintiff's] claim, remand is appropriate in this case." (quoting *Pratts*, 94 F.3d at 39)); *Taylor v. Astrue*, No. CV-07-3469 (FB), 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) ("[A]lthough an ALJ may elect not to assign controlling weight to the opinion of a treating physician where it is not well-supported by objective evidence, before reaching this conclusion, 'the adjudicator must make every reasonable effort to recontact the [treating physician] for clarification of the reasons for the opinion.'" (quoting Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *6 (S.S.A. July 2, 1996))); *Ewald v. Comm'r of Soc. Sec.*, No. CV-05-4583 (FB), 2006 WL 3240516, at *2 (E.D.N.Y. Nov. 9, 2006) ("[E]ven if correct evaluation of the medical records revealed inadequate support for [the treating physician's] opinion, the ALJ's duty was to recontact [the treating physician] . . . to fully develop the record."); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) ("It is not enough for the ALJ to simply say that [the treating physician's] findings are inconsistent with the rest of the record.").

In sum, the Court concludes that clarification from Dr. Buncke was necessary to assist the ALJ in determining whether or not plaintiff is disabled. On remand, the ALJ is directed to recontact Dr. Buncke for clarification of her opinions, and, to the extent necessary, further develop the record to obtain any additional information (including but not limited to the function-by-function assessment the ALJ referenced) regarding plaintiff's condition during the relevant time period.

### IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  September 22, 2015
        Central Islip, NY

\*\*\*

Plaintiff is represented by Michael Brangan of Sullivan & Kehoe, 44 Main St., Kings Park, NY 11754. The Commissioner is represented by Kelly T. Currie, Acting United States Attorney, Eastern District of New York, by Matthew Silverman, 271 Cadman Plaza East, Brooklyn, NY 11201.